**EXHIBIT A**

**EXHIBIT A**

Court of Common Pleas, Mahoning County
120 Market Street
Youngstown, Ohio 44503

# SUMMONS ON COMPLAINT
### Rule 4 Ohio Rules of Civil Procedure
------========*=========------

Case No. 2022 CV 01628

LYNNDORA WESTON, INDV   -vs-   NORTHEAST OHIO CORRECTIONAL CENTER
AND AS PERSONAL REP                  2240 HUBBARD ROAD
AND ADMR OF EST OF                  YOUNGSTOWN, OH 44505
LENZELL WESTON, DECD
2183 PROFESSOR ROAD, NO. 1
CLEVELAND, OH 44113

TO: **NORTHEAST OHIO**            **2240 HUBBARD ROAD**
**CORRECTIONAL CENTER**       **YOUNGSTOWN, OH 44505**
    Defendant

To the above named defendant(s): (See attached complaint for additional parties)

    You are hereby summoned that a complaint (a copy of which is hereto attached and made a part hereof) has been filed against you in this court by the plaintiff(s) named herein.

    You are required to serve upon the plaintiff('s') attorney, or upon the plaintiff(s) if he/she/they has/have no attorney of record, a copy of your answer to the complaint within 28 days after service of this summons upon you, exclusive of the day of service. Said answer must be filed with this court within three (3) days after service on plaintiff(s) attorney.

    The name and address of the plaintiff('s') attorney is as follows:

            DONALD P SCREEN
            1265 W 6TH STREET
            SUITE 400
            CLEVELAND OH 44113

    If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

                    ANTHONY VIVO
            Mahoning County Clerk of Courts

                September 13, 2022

            By: <u>N. Dascenzo</u>
                  Deputy Clerk

Summons issued to additional defendants:

CORECIVIC INC

ELECTRONICALLY FILED
2022 Sep 12 AM 10:44
Anthony P. Vivo, CLERK OF COURT - MAHONING

## IN THE COURT OF COMMON PLEAS
## MAHONING COUNTY, OHIO

| | |
|---|---|
| LYNNDORA WESTON, individually and as personal representative and administrator of the Estate of LENZELL WESTON, deceased<br>2183 Professor Road, No. 1<br>Cleveland, Ohio 44113<br><br>Plaintiff,<br><br>vs.<br><br>NORTHEAST OHIO CORRECTIONAL CENTER<br>2240 Hubbard Road,<br>Youngstown, Ohio 44505<br><br>CORECIVIC, INC.<br>5501 Virginia Way, Suite 110<br>Brentwood, TN 37027<br><br>JOHN DOES 1-20, Administrators, Corrections Officers, and Employees of NEOCC, Addresses Unknown<br><br>Defendants. | CASE NO. 22 CV 1628<br><br>JUDGE DONOFRIO<br><br>Jury trial demanded |

### COMPLAINT FOR WRONGFUL DEATH AND OTHER CLAIMS

Plaintiff Lynndora Weston, individually and as personal representative and administrator of

the Estate of Lenzell Weston, deceased, for her Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1.      On the morning of September 11, 2020, while isolated, unattended, and unmonitored in a cell at the Northeast Ohio Correctional Center in Youngstown ("NEOCC"), an obviously despondent Lenzell Weston wrapped a bedsheet around his neck, tied its other end to a bunk bed, and took his own life. It was not Lenzell Weston's first suicide attempt—just his first successful one.

2.      Although aware of Lenzell's long history of mental illness and recent acute symptoms, Defendants failed to take even ordinary precautions against this foreseeable event or otherwise render appropriate and required care.

3.      And despite being required to closely monitor Lenzell and conduct frequent rounds or "welfare checks," Defendants failed to do so on September 11, 2020, a failure for which two corrections officers were fired.

4.      Also, despite NEOCC's stated policy banning all illegal drugs and other contraband in the facility, the medical examiner determined that Lenzell had marijuana (a known mood-altering narcotic associated with suicidal ideation) in his system at the time of his death.

5.      Defendants' conduct, for which all Defendants are jointly and several liable and/or for which Defendants NEOCC and CoreCivic are liable under the doctrine of *respondeat superior*, was negligent, reckless, malicious, and/or intentional, and proximately caused foreseeable injuries and damages to Lenzell, to his estate, and to his sister and next of kin, Plaintiff Lynndora Weston. It also constitutes intentional infliction of emotional distress and gives rise to a claim under Ohio's wrongful-death and survivorship laws.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of this action because both NEOCC and CoreCivic reside in the state of Ohio and because all Defendants conduct business in Ohio and/or are, or were

2

2022 CV 01628

at the time of the events giving rise to Plaintiff's claims, employed in the state of Ohio. Venue is

proper in Mahoning County because both NEOCC and CoreCivic reside in this county and because

the actions complained of occurred in this county.

**JURY DEMAND**

7.      Plaintiff demands trial by jury in this action.

**PARTIES**

8.      Plaintiff Lynndora Weston is the sister, next of kin, and personal representative of

decedent Lenzell Weston and the administrator of his estate, having been so appointed by the

probate division of the circuit court of Cuyahoga County in Case No. 2022EST273824. She brings

this action in both capacities.

9.      Defendant NEOCC is a private correctional institution located in Youngstown,

Ohio owned and operated by Defendant CoreCivic, Inc.

10.     Defendant CoreCivic, Inc. ("CoreCivic") is a private, for-profit, publicly traded

company that owns and operates prisons and other detention facilities, in Ohio and elsewhere,

under contract with various government agencies. It exercises management and control over the

activities of its subsidiary facilities such as Defendant NEOCC.

11.     Defendants John Does 1-20 are duly appointed NEOCC administrators, medical

staff, corrections officers, and/or other employees or agents who, at all times relevant to the claims

asserted in this complaint, were acting in the course and scope of their employment or agency with

NEOCC and/or CoreCivic and were responsible for establishing, implementing, and/or abiding by

laws, regulations, standards, and policies governing conditions of inmate confinement, including but

not limited to the screening, assessment, and treatment of inmate mental health, the detection of

suicidal tendencies and intentions, the prevention of inmate self-harm, the conduct and frequency of

welfare checks, the personal and/or video observation and other mechanisms used to monitor

3

2022 CV 01628

inmate activities and welfare, and other matters relating to inmate welfare. They are sued in their personal capacities.

## FACTUAL BACKGROUND

**Upon his transfer to Northeast Ohio Correctional Center, Lenzell Weston's enduring struggle with his mental health was quickly established but disregarded by NEOCC staff.**

12.     On July 10, 2019, Mr. Weston was transferred from the Correctional Reception Center ("CRC") in Orient, Ohio, to NEOCC in Youngstown, Ohio. Mr. Weston was admitted to the CRC on July 16, 2018 after spending 719 days in the Franklin County Jail in Columbus, Ohio.

13.     Upon his arrival at NEOCC, Nurse Brooke Corso ("Nurse Corso" or "Corso") conducted an evaluation of Mr. Weston's physical and mental health and recorded concerning information in connection with various mental-health evaluative criteria.

14.     The next day, July 11, 2019, Mental Health Nurse Audra Fredenburg ("Nurse Fredenburg" or "Fredenburg") updated Mr. Weston's status from an "IntraSystem Transfer" to an "MH [Mental Health] IntraSystem Transfer" and ordered a "detailed mental health screen."

15.     On July 15, 2019, Nurse Fredenburg performed the detailed mental-health screen of Mr. Weston, whose results further evidenced Mr. Weston's longstanding battle to manage mental-health symptoms caused by his various psychiatric disorders.

16.     From Mr. Weston's first week at NEOCC, staff were aware and had documented that he had struggled with substance-abuse disorders for decades – a struggle that continued even during his period of incarceration.

17.     Corso's report indicated that Mr. Weston began drinking hard liquor at age 13, and before his incarceration drank frequently on weekends, averaging four to five eight-ounce drinks.

18.     The report also indicated that Mr. Weston began using marijuana at age 11, and not only smoked an average of three to four times daily before his incarceration but continued to

4

consume marijuana through July 1, 2018, during his time at the Franklin County Jail. Mr. Weston answered "Yes" to the question "Have you used drugs and/or alcohol since your incarceration?" NEOCC also gained access to Mr. Weston's CRC disciplinary file, which included records of an investigation and hearing after a urinalysis returned a positive result for THC.

19.     From Mr. Weston's first week at NEOCC, staff were aware and had documented that, before his incarceration, he had been hospitalized for schizophrenia and treated on an out-patient basis thereafter.

20.     Staff were also aware at that time, and had documented, that Mr. Weston had been treated for mental health symptoms *while* incarcerated and had previously been prescribed two powerful antipsychotics (Haldol and Seroquel), a sedative (Trazadone), and an antidepressant (Sinequan) to help manage his symptoms.

21.     Despite learning and having access to all this information, neither Corso nor Fredenburg assigned Mr. Weston any mental-health classifications, which would have identified him as an inmate to monitor for concerning behavior. Neither provided any referrals for additional mental-health evaluation or observation, and both recommended that he be released to "general population" housing.

**Soon after Mr. Weston's transfer to NEOCC, he predictably began to manifest unmistakable signs that navigating incarceration and other troubling life events without treatment was taking a severe toll on his mental state – something which his family, fellow inmates, and (eventually) NEOCC staff noticed.**

22.     Mr. Weston regularly communicated with his sister, Plaintiff Lynndora Weston, both by phone and via the "JPay" messaging system in use at NEOCC.

23.     The above-referenced calls and messages were subject to monitoring and were in fact monitored.

5

2022 CV 01628

24. Starting in the fall of 2019, Ms. Weston noted that her brother appeared increasingly erratic in their communications. He was "unbalanced" – swinging from manic to depressed, and his mood appeared to shift week-to-week, if not day-to-day.

25. Ms. Weston was concerned by her brother's behavior, particularly because of how openly and uncharacteristically emotional he seemed. This stood out to Ms. Weston because her brother had impressed upon her that it imperative to maintain a "tough" image while serving his sentence at NEOCC. Hyperaware of his reputation and persona, he was careful to avoid anything that might lead his fellow inmates to perceive him as "weak" or vulnerable.

26. When Mr. Weston's behavior escalated to the point that it reminded Ms. Weston of behavior he had exhibited years earlier, shortly before his first suicide attempt, Ms. Weston felt compelled to call NEOCC and implore its staff to conduct a thorough "welfare-check," and to keep a continuous and very close watch, on her brother.

27. When she finally got through to the NEOCC's staff, Ms. Weston found them to be apathetic and their response anemic. She remains unaware of whether they ever performed a welfare check or otherwise heeded her warnings.

28. By early 2020, signs that Mr. Weston was deeply unwell had outgrown his ability to conceal his emotions and were too apparent for some inside the prison to ignore.

29. On January 7, 2020, an unnamed corrections officer ("CO") observed Mr. Weston openly "crying by the phones in the day room." As his mental was visibly crumbling, and his struggles either ignored or overlooked by the prison's medical staff, the unnamed CO noted seeing other inmates stepping in to try and comfort Mr. Weston.

30. The CO heard inmates mention that Mr. Weston had recently received "bad news" – one inmate related that the news pertained to the recent murder of two individuals to whom Mr. Weston was particularly close.

2022 CV 01628

31. When Mr. Weston met with Psychiatric Supervisor Justin Shelton ("Shelton") two days later, Mr. Weston confirmed that his lifelong best friend and his wife had been murdered three days earlier.

32. During their January 9, 2020, meeting, Mr. Weston professed feeling considerable grief over the recent tragedies, describing to Shelton the enormity of the loss.

33. Shelton noted that Mr. Weston was clearly "grieving," and had described the losses as "a lot" to manage. But Shelton remained unconcerned.

34. Following their meeting, Shelton wrote in his "SOAP note" that, despite the "numerous losses" Mr. Weston had recently endured, he believed in the power of "working as a barber" as Mr. Weston's "main coping skill."

35. During the January 9, 2020, meeting with Shelton, Mr. Weston also admitted that he continued to experience auditory hallucinations.

36. However, Shelton believed that Mr. Weston was not experiencing "any distress as a result" of the hallucinations and agreed that Mr. Weston's "awareness of his disorder" empowered him to "keep pushing," and work through his symptoms.

37. Shelton required no follow-up meetings, did not update Mr. Weston's mental-health classifications, and provided no treatment.

38. NEOCC's records show that the next "encounter" Shelton had with Mr. Weston was 12:55 p.m., September 11, 2020 – five hours after Weston was found hanging from his bunk.

**Mr. Weston was left to manage his schizophrenia and grief himself, spending his last months subjected to periods of isolation and openly expressing the depths of his pain.**

39. Between July 1, 2020 and July 6, 2020, Mr. Weston was kept in isolation following a random COVID-19 test – an experience that worsened his mental-health symptoms, as reflected in messages transmitted via JPay to his sister Lynndora.

7

2022 CV 01628

40.     On July 13, Licensed Professional Counselor Kevin Davis ("Davis") was warned that Mr. Weston appeared to be struggling with "grief and mental symptoms."

41.     Despite the warning, and access to both Fredenburg's detailed health screen and Shelton's SOAP notes, Davis too failed to act, providing Mr. Weston no treatment and failing to add the relevant mental-health classifications.

42.     On August 20, 2020, an unidentified CO referred Mr. Weston to the infirmary to receive treatment for a facial injury. Certified Nurse Practitioner Mary Ritter ("Ritter") provided Mr. Weston medical attention for a three-centimeter laceration on his left eyebrow, requiring six sutures.

43.     Nurse Lisa Cox ("Cox") indicated in her summary of the infirmary visit that Mr. Weston reported having sustained the injury after drinking alcohol – he claimed to have fallen, hitting his head against a metal portion of his bed.

44.     Unlike his experience at CRC, at which Mr. Weston was required to submit a urine sample under suspicion of drug use and disciplined when the test was positive for THC, Mr. Weston left NEOCC's infirmary, for all Nurse Cox knew, free to continue self-medicating with alcohol.

45.     On August, 25, 2020, following the death of his spouse, Mr. Weston expressed the extent of his mental anguish to friend and former romantic interest Kristel Wheeler. He admitted to understanding why those in similar situations have been driven to suicide. In the message, transmitted via JPay, Mr. Weston wrote, "I hate to say this but I see why people who kill there spouse commit suicide after because this shit will drive u crazy and theres no out every thought awake and every dream is a nightmare." He added, "Im dead Im just conscious and I can feel everything and it hurts all the time."

46.     In a September 6, 2020, message to Ms. Wheeler transmitted via JPay, Mr. Weston admitted to struggling with his manic depression and schizophrenia. He again expressed suicidal ideation, confessing that "sometimes I really wanna end it." Mr. Weston shared that he had to be his

2022 CV 01628

"own caretaker" in prison and wrote about his experience with his previously prescribed medication during his time at the Franklin County Jail. Its sedative "numbing effect" impeded his ability to defend himself from another inmate's aggressive advances. He discontinued taking the medication for fear that a similar incident could happen again.

47.     In the September 6, 2020, message to Wheeler, Mr. Weston also describes a recent fight with an inmate who owed him several hundred dollars. The inmate "pulled a metal pipe," and struck Weston in the head. Mr. Weston admitted to "beating" the inmate "until he wasn't moving."

**Mr. Weston was screened for suicide risk on September 10, 2020, one day before his suicide.**

48.     On September 10, 2020, one day before his suicide, Mr. Weston was referred to the infirmary following yet another altercation with another inmate. The "evaluation" was performed by Nurse Cox and included a screen for risk of suicide.

49.     Under the Standards of the American Correctional Association, by which NEOCC is required to abide, all inmates in restrictive housing must be "personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, on an irregular schedule." Inmates who are "violent or mentally disordered" or "demonstrate unusual or bizarre behavior or self-harm" must receive more frequent observation. In those cases, the level of observation (from minimal to constant) "must be made by a qualified mental health professional."

50.     There is no question that Mr. Weston, a diagnosed schizophrenic, was "mentally disordered"– a fact of which NEOCC medical staff were well aware when (indeed long before) they placed him in restricted housing for violent behavior (i.e., fighting) on September 10, 2020.

51.     Despite Mr. Weston's recorded history of schizophrenia and the fact that he was placed in restricted housing as a result of violent behavior, the determination of whether "regular" restrictive housing was appropriate was left to Cox, a registered nurse, rather than one NEOCC's mental-health specialists.

9

2022 CV 01628

52. Cox was not a qualified mental health professional and should not have decided whether Mr. Weston required heightened observation during his placement in restrictive housing.

53. Though she had access to Mr. Weston's records, Cox did virtually no investigation to determine whether Mr. Weston met any of the suicide risk criteria evidenced in the questionnaires.

54. While they had failed to treat Mr. Weston thus far, perhaps Fredenberg or Shelton could have determined that "crisis status" was appropriate, given the escalation of his mental-health prolems, in both frequency and apparent severity, during his time at NEOCC.

55. Cox "evaluated" Mr. Weston upon his admission to restrictive housing. As part of this evaluation, she "screened" Mr. Weston for a general risk of self-harm and an imminent risk of self-harm by asking a set of fourteen pre-written questions.

56. Based on NEOCC's records of this encounter, Cox spent exactly three minutes evaluating Mr. Weston in the hallway. After checking "No" to each of the questions set forth in the boiler-plate form, Cox determined that no mental health referral was required or warranted.

57. Cox knew or should have known that many of these responses directly conflicted with NEOCC's records of Mr. Weston's prior encounters with mental-health specialists and with the Mental Health Detailed Screen Fredenburg conducted in July 2019. This was the case even for questions that weren't subjective or based on contemporaneous symptoms.

58. For example, Cox writes "No" in response to the questions asking whether Mr. Weston has a history of psychiatric hospitalization and outpatient mental health treatment. Mr. Weston's psychiatric history is an objective, verifiable fact of which NEOCC was well aware, not a subjective question for Mr. Weston to answer or Cox to interpret.

59. Nor did it make sense to ask Mr. Weston if he had a "current mental health concern." Despite patient denials, schizophrenia does not simply go away—it is an ongoing battle. While many treatments are considered effective, Mr. Weston received none of them. Schizophrenia

2022 CV 01628

is not considered curable. Nor is it effectively treated by a patient's endeavoring to "manage" his own symptoms by ignoring or "pushing through" them, as Shelton felt sufficient.

60.     Following Nurse Cox's "evaluation," Mr. Weston was released from the infirmary into "restrictive housing," not due to mental-health concerns but for fighting. Mr. Weston was neither placed on "crisis status" nor referred to "Mental Health Services."

**On September 11, 2020, after corrections officers had failed to make timely rounds, Mr. Weston was found unconscious in his cell, hanging from his bunk by "a handmade rope" – a piece of his bedsheet he had fashioned into a noose. The officers were fired, and a toxicology report revealed the presence of marijuana in Mr. Weston's system.**

61.     On September 11, 2020, NEOCC's Warden notified Ms. Weston that Lenzell had passed from suicide by hanging – his unresponsive body found in isolation. NEOCC's records indicate that Mr. Weston was found at approximately 7:34 a.m. that morning. Crissman's reports detail the responding staff's unsuccessful efforts to revive Mr. Weston before he was transported to Saint Elizabeth's hospital in Youngstown, Ohio, where he was pronounced dead at 8:14 a.m.

62.     As mentioned above, ACA Guidelines "require that all Restrictive Housing Inmates are personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior or self-harm receive more frequent observation; suicidal inmates are under continuous observation. Observation shall be documented on a log. A qualified mental health professional will determine the type of observation (minimal to constant)."

63.     The day before his suicide, Mr. Weston was involved in a fight with another inmate and observed to be displaying other unusual and violent behavior.

64.     During the days and hours preceding Mr. Weston's suicide, NEOCC personnel observed Mr. Weston far less frequently than twice per hour and in intervals substantially longer than 40 minutes.

2022 CV 01628

65.     On information and belief, NEOCC personnel delivered food to Mr. Weston in his cell at 5:40 a.m. on September 11, 2020, but did not observe him against until 7:34 a.m. that morning (a time interval of one hour and 54 minutes), by which time Mr. Weston had already died.

66.     Despite Mr. Weston's perceived displays of bizarre, unusual, and violent behavior, NEOCC personnel did not increase the frequency of observation but instead allowed inappropriately long intervals to elapse between observations.

67.     On information and belief, NEOCC fired two corrections officers, John Does 1 and 2, for their failure to follow NEOCC's inmate-monitoring policy and for other negligent acts and omissions.

68.     On information and belief, a medical examiner's postmortem toxicology report showed the presence of marijuana in Mr. Weston's system.

69.     It is illegal, and contrary to NEOCC rules and national and state penal standards and practices, for inmates to receive, possess, or consume marijuana while incarcerated.

70.     Due to the COVID-19 pandemic, all inmate visitation was suspended at NEOCC from March 2020 through the date of Mr. Weston's death and beyond.

71.     The presence of marijuana in Mr. Weston's system is *res ipsa loquitur* evidence of NEOCC's negligent or reckless failure to enforce its ban on the presence and use of a controlled substance on its premises as well as evidence of a serious breach, on NEOCC's part, of its contraband security protocol and policy.

72.     Marijuana is widely known to be a mood-altering narcotic. According to a recent study conducted by the National Institute on Drug Abuse (part of the National Institutes of Health) and published in the *JAMA Open* (a publication of the *Journal of the American Medical Association*), marijuana use is also associated with increased risks of suicidal ideation, suicide planning, and suicide attempts, results observed even after controlling for possible contaminating variables such as user

12

depression. Several other reputable studies confirm a similar association between the use of marijuana and suicides.

73.     NEOCC's negligence and/or recklessness in permitting and/or failing to detect the presence of, and prevent the use of, marijuana in its facility likely contributed to Mr. Weston's suicidal motivation and, hence, to his death.

## DAMAGES

74.     As a direct and proximate result of the acts and omissions set forth in this complaint, Lenzell Weston sustained injuries and suffering before his death.

75.     As a further direct and proximate result of the wrongful death of Lenzell Weston, his sister and next of kin, Plaintiff Lynndora Weston, suffered damages, including but limited to the loss of his support, services, and society, including lost companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, as well as pecuniary losses (including funeral and burial expenses) and severe emotional distress.

76.     Defendants are jointly and/or severally liable for these injuries and damages. Defendants NEOCC and CoreCivic are also liable for all these injuries and damages both for their own negligence and recklessness and, under the doctrine of *respondeat superior*, for that of all other Defendants.

## CLAIM 1
## Negligence (against all Defendants)

77.     *Plaintiff* incorporates all previous allegations.

78.     Defendants had a duty to exercise due care for Lenzell Weston.

79.     In acting and omitting to act as alleged in this complaint, Defendants breached the duty of care they owed to Mr. Weston.

80.     As a direct and proximate result of Defendants' multiple breaches, Plaintiff as well

2022 CV 01628

as Mr. Weston and his estate suffered the injuries and damages alleged in this complaint.

81.　　Such injuries and damages were the foreseeable result of Defendants' acts and omissions as alleged in this complaint.

82.　　Defendants committed the acts and omissions alleged in this complaint in a negligent, reckless, willful, and/or wanton manner.

83.　　Defendants are jointly and severally liable, or are liable under the doctrine of *respondeat superior*, for this conduct and for these injuries and damages.

### CLAIM 2
### Wrongful Death Under Ohio Rev. Code 2125.01 and 2125.02 (against all Defendants)

84.　　Plaintiff incorporates all previous allegations.

85.　　Lenzell Weston is survived by Plaintiff Lynndora Weston, his sibling, sole surviving relative, and next of kin, who has suffered and will continue to suffer, among other damages, pecuniary loss (including funeral and burial expenses), loss of his aid, comfort, and consortium, society, financial and other support, companionship, guidance, and protection, as well as the grief and sorrow from the loss of the love and affection of and for her loved one.

86.　　As a direct, proximate, and foreseeable result of the Defendants' acts, omissions, and defaults as alleged in this complaint, Plaintiff was deprived forever of her brother's love, support (financial and other), services, care, companionship, advice, guidance, counsel, instruction, and society, and incurred funeral and burial expenses and other expenses.

87.　　As a direct and proximate result of the Defendants' acts, omissions, and defaults, Plaintiff suffered mental anguish and extreme emotional distress.

88.　　The wrongful death of Lenzell Weston was proximately caused by the neglect, default, and willful, wanton, and/or reckless conduct of Defendants.

89.　　Defendants acted negligently, recklessly, intentionally, and with malice and willful,

2022 CV 01628

wanton, and/or deliberate indifference in committing the acts and omissions alleged in this complaint, which acts and omissions resulted in the injuries and damages suffered by, and the wrongful death of, Lenzell Weston, as well as the damages suffered by his estate and by Plaintiff.

90.     As a direct and proximate result of Defendants' acts and omissions as alleged in this complaint, Lenzell Weston died on September 11, 2020, subjecting Defendants to liability for wrongful death under R.C. 2125.02.

### CLAIM 3
### Survivorship (against all Defendants)

91.     Plaintiff incorporates all previous allegations.

92.     As a direct, proximate, and foreseeable result of the willful, wanton, reckless, and/or intentional conduct of Defendants, individually and/or jointly, and/or by their agents and employees, Lenzell Weston was caused to suffer mental anguish and conscious physical suffering before his death for which Defendants are liable.

93.     Defendants owed Lenzell Weston a duty of care. Their breach of that duty was the direct, proximate, and foreseeable cause both of his death and of the mental and physical suffering he experienced before his death, which renders Defendants liable under R.C. 2305.21.

### CLAIM 4
### Respondeat Superior (against Defendants NEOCC and CoreCivic)

94.     Plaintiff incorporates all previous allegations.

95.     As alleged above, Defendants failed to exercise due care and acted in a willful, wanton, and reckless manner.

96.     This reckless, wanton, and willful conduct proximately caused the death of Lenzell Weston.

97.     Defendant NEOCC, as employer of Defendants John Does 1-20, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

98.     Defendant CoreCivic, as employer of Defendants John Doe 1-20 and as parent, owner, and operator of NEOCC, is responsible for these Defendants' wrongdoing under the doctrine of *respondeat superior*.

99.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Lenzell Weston and Plaintiff sustained the damages alleged above.

### CLAIM 5_
### Negligent and/or Reckless Training and Supervision (against Defendants NEOCC and CoreCivic)

100.    Plaintiff incorporates all previous allegations.

101.    Defendants NEOCC and CoreCivic failed to exercise due care and acted in a negligent, willful, wanton, and/or reckless manner in training and supervising, or in failing to train and supervise, Defendants John Does 1-20, which failures caused or contributed to the negligent, reckless, willful, and/or wanton acts and omissions alleged in this complaint.

102.    Defendants' reckless, wanton, and/or willful conduct in this regard proximately caused the death of Lenzell Weston and the damages to his estate and to Plaintiff.

### CLAIM 6
### Intentional Infliction of Emotional Distress (against all Defendants)

103.    Plaintiff incorporates all previous allegations.

104.    Defendants intended, or knew or should have known, that their actions would result in serious emotional distress to Plaintiff and others.

105.    Defendants' conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community.

106.    Defendants' acts and omissions proximately caused serious emotional distress and other psychological injury to Plaintiff.

107.    Plaintiff suffered mental anguish and emotional distress so severe that no reasonable person could be expected to endure it.

2022 CV 01628

## PRAYER FOR RELIEF

Ms. Weston respectfully requests the following relief from this Court:

A.      Enter judgment in favor of Ms. Weston and Mr. Weston's estate on all claims for relief;

B.      Award full compensatory damages, including but not limited to such damages for pecuniary loss, pain and suffering, mental anguish, and emotional distress as Ms. Weston has suffered and is reasonably certain to suffer in the future;

C.      Award punitive and exemplary damages for the Defendants' egregious, willful, and malicious conduct;

D.      Award pre- and post-judgment interest at the highest lawful rate;

E.      Award Ms. Weston her reasonable attorneys' fees and all other costs of suit; and

F.      Award all other relief in law or equity to which Ms. Weston is entitled and that this Court deems equitable, just, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues within this complaint.

Date: September 11, 2022

Respectfully submitted,
THE CHANDRA LAW FIRM LLC
*/s/ Donald P. Screen*
Subodh Chandra (0069233)
Donald P. Screen (0044070)
The Chandra Law Building
1265 W. 6th Street, Suite 400
Cleveland, Ohio 44113.1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Don.Screen@ChandraLaw.com

*Attorneys for Plaintiff Lynndora Weston*

2022 CV 01628

## INSTRUCTIONS TO CLERK

Please make service upon the following:

Northeast Ohio Correctional Center
2240 Hubbard Road
Youngstown, Ohio 44505
Attn: David Bobby, Facility Leader and Warden

CoreCivic, Inc.
5501 Virginia Way, Suite 110
Brentwood, TN 37027
Attn: Damon T. Hininger, President and Chief Executive Officer

IF UNDELIVERABLE RETURN TO

**ANTHONY VIVO**

Mahoning County Clerk of Courts
120 MARKET STREET, YOUNGSTOWN OHIO 44503-1756

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**

9414 7266 9904 2185 8481 06

2022 CV 01628
9414 7266 9904 2185 8481 06

NORTHEAST OHIO CORRECTIONAL
2240 HUBBARD ROAD
YOUNGSTOWN, OH 44505

Scan
Delivered

Received By

Warden's Office

9.15.22

US POSTAGE PITNEY BOWES

ZIP 44503 $ 008.30⁰
02 4W
0000362976 SEP 13 2022

Thank you for using Return Receipt Service



FOLD AND TEAR THIS WAY

RETURN RECEIPT REQUESTED
USPS®MAIL CARRIER
DETACH ALONG PERFORATION

Thank you for using Return Receipt Service

C